IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Case No. 24-cr-93-JEB |
| | ) |
| GREGORY YETMAN, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM OF GREGORY YETMAN**

Before January 6, Gregory Yetman, 47, had built a successful career in the Army National Guard, honorably serving for over a decade. Sergeant Yetman had been deployed to the war in Afghanistan and served in Cuba as well as on assignments abroad with federal agencies. He had been awarded Army commendation medals for humanitarian missions, outstanding volunteer service and Honor Guard missions. Those career highlights came as no surprise to Yetman's family and friends, who describe his caring and genial nature.

Regrettably, however, Yetman got swept up in the madness of the crowd that descended on the Capitol that day. Like too many others, he engaged in outrageous conduct there, using a cannister of pepper spray to shower a noxious aerosol over nearby law enforcement officers. Yetman deeply regrets his shameful conduct, for which he accepted responsibility without delay. At sentencing he will apologize with feeling to the law enforcement officers affected by his offense. At the same time, mitigating factors present themselves. No one was injured as a result of Yetman's actions. He deserves respect for his service to the country, has no criminal history and is unlikely to recidivate. Particularly in light of this Court's sentence in *United States v. Justin Adams*, 22-cr-350-JEB, which also involved a § 111(a) offense but more serious conduct,

1

Yetman respectfully submits that a prison sentence of one year and a day would be sufficient but not greater than necessary to provide a just punishment for his 12-second offense. But, at all events, Yetman urges that his sentence should not exceed the 17 months' incarceration imposed in *Adams*.

**Factual background**

     A.     **Yetman's background, family, employment history and character**

Yetman, now 47, was raised in a stable, middle-class home in New Brunswick, New Jersey, though his parents divorced when he was 16 years old. Today, he and his five brothers care for their 82-year-old mother, providing her with financial support. Yetman's father passed away a number of years ago. The defendant never married. Two themes emerge from the mitigation letters family and friends have submitted on his behalf. Yetman Ltrs. in Supp., Exh. 1.

The first is Yetman's service to the country. Though he has obtained an associate degree in criminal justice (2012) and a bachelor of science degree in public safety administration (2019), Yetman has dedicated his career to the Army National Guard in which he served honorably from 2008 to 2022. As a military police officer he achieved the rank of sergeant. Yetman deployed to the war in Afghanistan and served in Cuba as well as on assignments with the Federal Emergency Management Administration.

One letter is from Yetman's superior officer in Kabul. Exh. 1, p. 19. Yetman was "entrusted with many important missions," writes the officer, owing to his "dedication and integrity." *Id.* The "main thing" Yetman's superior noticed about him was that he "was not the type to lay blame on others as he always took responsibility for that which was under his control." *Id.* Yetman was also esteemed for "his honesty, whether it be good or bad. . ." *Id.*

2



*Sgt. Yetman (middle) posing for a photograph in Afghanistan with interpreters*

Sergeant Yetman's chief contribution to the war effort was not violent. Another writer notes that Yetman earned a Military Outstanding Volunteer Services Medal (MOVSM) in 2012-2013 for his volunteer work—"humanitarian missions to women's shelters, orphanages, and schools." Exh. 1, p. 17. Yetman furnished "food, school supplies, toys, clothing. . ." *Id.* He also "helped work with the Boy and Girl Scouts organizations that [assisted] children in Afghanistan" and "made fuel donuts for Afghan families which they used to [] heat their homes." *Id.*

Sergeant Yetman was awarded another MOVSM while serving in Cuba between 2015-2016. Exh. 1, p. 17. There, he distinguished himself by giving assistance to elderly Cuban refugees living in a retirement community at Guantanamo Bay, bathing and dressing them and serving them food. *Id.*

[Images appear on following page.]





*Images of Army Achievement and Commendation Medals awarded to Sgt. Yetman*

The second theme that emerges from the letters is Yetman's caring and selfless character in his personal life. Of his five brothers, it was Yetman who supplied their mother "with the funds that prevented [her] from losing [her] home to foreclosure." Exh. 1, p. 4. And before Yetman's father died, the two would "volunteer with the Habitat for Humanity to help build homes" in New Jersey. *Id.*, p. 17.

A friend tells the story of her abusive marriage in which she was the victim of domestic violence. *Id.*, p. 1. Yetman "gave [her] the courage and support [she] needed to leave [her] husband and pursue a restraining order." *Id.* She adds:

4

> Greg volunteered to help me any way he could, including taking care of the landscaping at my marital home throughout the summer.  My parents had to sell their house in the fall of 2019 and move into assisted living while I was also in the process of buying a new house closer to them.  Greg was there every step of the way, helping both me and my parents.  He made countless trips to move furniture . . . Greg . . . served as my protector, and he taught me self-defense moves in case my ex ever attacked me again . . .

Exh. 1, p. 2.

Yetman's good deeds were not reserved for family and friends alone.  Two writers recount the time they were given urgent assistance from a complete stranger.  Exh. 1, p. 5.  They were camping at a music festival in Virginia when an unexpected storm descended.  The couple were left dangerously exposed to "powerful winds, downpours, lightning and hail." *Id.*  Yetman appeared out of nowhere.  He "physically held [the] canopy in place during the windiest portion of the storm and helped save our camp from extreme damage while we were stuck inside the festival grounds . . ." *Id.*  He then "allowed us to use his solar power bank to charge our electronics" and offered food and drink.  *Id.*

As for Yetman's employment prospects and contributions to the community, the Court should consider the letter submitted by his current employer.  The owner of an excavating company explains that he has employed Yetman for over five years.  Exh. 1, p. 8.  He writes:

> I cannot begin to say how valuable an employee Greg is to our company.  He exemplifies everything an employer would expect from an employee.  His current position as foreman is sorely missed here.  He is a critical employee to the ongoing success of a 76-year-old company.  His reputation and respect among his peers as well as our clients are second to none.

Exh. 1, p. 8.

  B. **The § 111(a) conviction, PSR, and Guidelines calculation**

On April 25, 2024, Yetman pled guilty to one count of assaulting, resisting or impeding certain officers, pursuant to 18 U.S.C. § 111(a).

Yetman's Statement of Offense described his criminal conduct as follows.

5

> Yetman climbed up to the platform on the West Terrace and was among the rioters encircling remaining police officers who continued to attempt to defend the federal Capitol building during the civil disorder. An isolated group of officers (who were visibly wearing police uniforms) struggled with the riotous mob but were quickly surrounded and assaulted from all sides. At approximately 2:29 p.m., as other rioters continued to assault those officers, Yetman picked up an MK-46H cannister containing OC spray (a lachrymatory agent capable of causing serious bodily injury), held the cannister under his arm, and, from within the effective distance of the spray, intentionally assaulted the same group of besieged police officers by spraying them with the OC spray. After Yetman sprayed multiple officers for approximately 12-14 seconds, the officers retreated towards other officers and left the area. The defendant discarded the MK-46H cannister on the platform.

Statement of Offense, p. 4.

On June 14, the Probation Office produced a PSR. The Base Offense Level is 14, under U.S.S.G. § 2A2.2(a). Four levels are added for the use of a dangerous weapon. PSR, ¶ 32 (citing U.S.S.G. § 2A2.2(b)(2)(B)). Six levels are added because the victim was a government officer. *Id.*, ¶ 33 (citing U.S.S.G. § 3A1.2(b)). Three levels are subtracted for acceptance of responsibility. *Id.*, ¶¶ 38-39 (citing U.S.S.G. §§ 3E1.1(a), (b)). That leaves a total offense level of 21 which, in Criminal History Category I, yields a Guidelines range of 37 to 46 months' incarceration. *Id.*, ¶ 82.

**Argument**

**I.      Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence. *United States v. Booker*, 543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007). Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements. It may make its own policy judgments, even if different from those in the Guidelines. *Kimbrough*, 552 U.S. at 101.

6

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

**II.     The § 3553(a) factors favor a downward variance in Yetman's case**

    **A.     The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))**

A number of considerations under § 3553(a)(1) warrant a downward variance in Yetman's case: (1) Yetman's offense is likely not what the Sentencing Commission meant by "aggravated" assault; (2) Yetman's history of good deeds and military service; and (3) his true remorse.

        **1.     Yetman's offense is likely not what the Sentencing Commission meant by "aggravated" assault**

Yetman starts at Base Offense Level 14, rather than level 10 under U.S.S.G. § 2A2.4, because his offense is categorized as an "aggravated" assault.  U.S.S.G. § 2A2.2.  But one may reasonably question whether his conduct is what the Commission had in mind.[1]

For purposes of § 2A2.2,

> "Aggravated assault" means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.

U.S.S.G. § 2A2.2 cmt. n. 1.

---

[1] Yetman does not resile from the terms of his plea agreement, nor dispute the PSR's Guidelines calculation.  His argument is based in policy, which the Court may take into consideration under § 3553(a).  *Kimbrough*, 552 U.S. at 101.

7

Here, the Statement of Offense does not assert that Yetman (1) intended to cause bodily injury; (2) caused serious bodily injury; or (3) strangled, suffocated or attempted to strangle or suffocate the victim. Rather, it states that Yetman "acted with the intent to commit another felony, namely, obstructing officers during a civil disorder in violation of 18 U.S.C. § 231(a)(3)." Statement of Offense, p. 6. Thus, the plea agreement's Guidelines calculation rests on subsection (D) of Application Note 1 to § 2A2.2.

However, the "another felony" to which the plea agreement refers does not consist of criminal conduct different from that which supports Yetman's conviction under § 111(a). The twelve-second act of spraying pepper spray at law enforcement officers was the basis for charges under both § 111(a) and § 231(a)(3). And there are good reasons for supposing that the Commission did not intend to reduce the meaning of "another felony" to a mechanical application of the double jeopardy test announced in *Blockburger v. United States*, 284 U.S. 299 (1932), i.e., whether each offense has an element that the other lacks.

What the Commission likely had in mind is a different criminal purpose animating, or at least ancillary to, the sentencing offense, for which additional punishment is warranted. One example suffices. Suppose the court is sentencing a defendant on an assault charge in connection with a narcotics sale. Enraged by a drug user's request to sample a few ounces of cocaine before making a purchase, the defendant-dealer strikes the victim's face to accelerate negotiations. We say that the defendant intended to commit "another felony" not because of some technical comparison of elements having to do with double jeopardy but because the assault was paired with the purpose of committing an offense in a different category, narcotics distribution.

In contrast to that common-sense understanding of the phrase "another felony," the government contends here that Yetman committed assault (§ 111(a)) with the intent to commit

8

the same assault (§ 231(a)(3)), a tautology.  Yet the elements separating the § 111(a) and § 231(a)(3) offenses have nothing to do with the defendant's *intent* but rather are jurisdictional or contextual elements (concerning the riot's effect on commerce, the existence of a civil disorder which need not be intended by the defendant, etc.).

Beyond the interpretive point, it should be emphasized that Yetman's offense did not cause physical injury to anyone and lasted approximately 12-14 seconds.[2]

These are sound reasons to downwardly vary.

### 2. Yetman's good deeds and community/family support

After *Booker-Gall-Kimbrough*, the case law is clear that good works, both exceptional and otherwise, whether performed pre-indictment or post-indictment, are a valid basis for a downward variance.  See *United States* v. *Tomko*, 562 F.3d 558, 560 (3d Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008).  In addition, the financial and emotional support on the outside that a defendant can be expected to receive from family and community members is another valid basis for a downward variance. *E.g.*, *United States v. Sayad*, 589 F.3d 1110, 1114-15 (10th Cir. 2009) (defendant's "supporting and loving family" a reason for downward variance); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (family support one of several valid grounds for downward variance from 41-51 months to probation); *United States v. Martin*, 520 F.3d 87, 92 (1st Cir. 2008) (family support one of three valid reasons for 91-month downward variance).

---

[2] The PSR notes that when agents arrived at his home to arrest him in November 2023, Yetman fled on foot into the woods.  PSR, ¶ 25.  That led to a two-day search which ended when Yetman turned himself in to local police.  *Id.*  As he will explain in allocution, Yetman deeply regrets the trouble he caused.  He did not believe he would actually escape justice; he was acting out of fear.

9

As outlined above, Yetman has served his country honorably for over a decade in the Army National Guard, including through an intense deployment to Afghanistan. His service was distinguished by commendations and medals awarded for his humanitarian endeavors. Acts of kindness and generosity also mark his private life, as seen in the mitigation letters. Yetman's 82-year-old mother relies on his emotional and material support. Finally, the Court can expect Yetman's swift rehabilitation and reintegration into the community. His employer writes that Yetman will begin work as soon as he is released.

### 3. Yetman's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance. And district courts may vary downward based on remorse without regard to whether the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 has already been applied. *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

As explained above, Yetman deeply regrets his decision to spray law enforcement during the riot. To the extent his actions contributed to the distress of outnumbered law enforcement officers, he offers them his sincere apology. Yetman would seize an opportunity to offer assistance to injured officers and to contribute to the repair of physical damage to the Capitol. Yetman will personally demonstrate remorse at sentencing in his allocution.

### B. Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).

A sentence higher than a term of incarceration for a year and a day would create unwarranted sentence disparities. Consider this Court's sentence in *Adams*. On his own, the

10

defendant walked right up to a line of police guarding the Lower West Plaza and began attacking them. *Adams*, 22-cr-350-JEB, ECF No. 27, p. 6. Adams "struck [an officer] twice in the head with his hands." *Id.*, p. 8. One of the blows hit the officer's face mask. The second blow directly landed on the officer's exposed face. *Id.*



*Adams striking officer in the face,* Adams, 22-cr-350-JEB, ECF No. 27, p. 9.

Adams wasn't finished. A few minutes later, he began dismantling bike racks. *Adams*, 22-cr-350-JEB, ECF No. 27, p. 11. Confronted by an officer, Adams threw a water bottle at him—a second assault. *Id.*, p. 12. Adams pled guilty to a § 111(a) charge.

While Adams had served his country in the armed forces like Yetman, it was for a shorter period of time and Adams apparently did not see combat. *Adams*, 22-cr-350-JEB, ECF No. 26, p. 6. It is true that Adams' case did not involve a "dangerous weapon," unlike Yetman's. *Id.* But, of course, a clenched fist is a "dangerous weapon" and in Adams' case it proved far more perilous than the aerosol Yetman sprayed. Moreover, throwing a punch to a victim's face reveals a level of mens rea significantly higher and more focused than that involved in spraying

11

pepper spray in the general direction of law enforcement officers wearing helmets with eye shields.

The Court sentenced Adams to 17 months' incarceration and one year of supervised release. Given Yetman's less dangerous conduct, an incarceration sentence here of more than a year and a day would create an unwarranted sentence disparity.

Consider the sentence imposed in *United States v. Mark Leffingwell*, 21-cr-5-ABJ (D.D.C. 2021). Unlike Yetman, Leffingwell entered the Capitol Building. *Id.*, ECF No. 31, p. 2. But "Leffingwell was not content to merely stand inside the threshold":

> Positioned at the front of the line of rioters stacked hundreds deep behind him, Leffingwell chanted at the officers standing before him to "join us!" in the rioters' efforts to assault the Capitol. When some in the crowd shouted for the rest of the crowd to "back up," Leffingwell rebuked them, shouting "If you back up, you'll never get back in!" When U.S. Capitol Police Officers D.A and W.H tried to repel Leffingwell and the gathering crowd, *Leffingwell struck both officers in the head.*

*Id.*, p. 2 (emphasis added).

Specifically, Leffingwell "first punched Officer D.A. in the head, and then as he continued to swing, he punched Officer W.H. in the head, before eventually punching Officer D.A. once more." *Id.*, p. 8. His conduct was so brazen that he was one of the few protesters arrested on the scene. *Id.*, p. 9. Leffingwell pled guilty to a felony offense under § 111(a)(1). *Id.* The government sought a sentence of 27 months' incarceration. *Id.*, p. 2.

The Court imposed a sentence of *six months' incarceration* with credit for time served, followed by 24 months of supervised release. Sentencing Yetman to more than a year and a day of incarceration would create a gross unwarranted disparity with respect to *Leffingwell*. Unlike Leffingwell, Yetman did not enter the Capitol Building. Unlike Leffingwell, he did not encourage other protesters to enter the building. Above all, when Leffingwell *punched two officers in the head multiple times*, that act cannot admit of any intent except to inflict bodily

12

injury on the officers. By contrast, while Yetman's offense was reckless and deplorable, one cannot assume from the act alone that he intended to inflict bodily injury on officers who were not in fact injured. Even if Leffingwell had other mitigating factors that Yetman lacks, to give Yetman a sentence many times higher than Leffingwell's would create manifest unwarranted disparity.

Consider *United States v. David Blair*, 21-cr-186-CRC (D.D.C. 2021). Carrying a Confederate flag, Blair walked up to a police line outside the Capitol. He turned toward an officer and said, "What's up motherfucker, what's up, what's up bitch?" 21-cr-186, ECF No. 55, p. 8. When the officer came close to Blair, the defendant struck him with a lacrosse stick, a dangerous weapon. *Id.* A search incident to arrest recovered a knife in the defendant's backpack.



21-cr-186, ECF No. 55, p. 8.

Blair pled guilty to a § 231(a)(3) offense. This defendant was sentenced to *five months' incarceration*. Just as in *Leffingwell*, Blair's acts could only be interpreted as intended to inflict bodily injury or to threaten it. Thus, to sentence Yetman over three times higher than Blair would create unwarranted sentence disparity.

13

Yetman cannot comprehensively examine every § 111(a) sentence in the Capitol riot cases without exhausting the Court's patience.  It is sufficient to observe that a sentence higher than a year and a day in prison would create a number of unwarranted sentence disparities. *United States v. Young*, 1:21-cr-00617-DLF (8 months' incarceration); *United States v. Dillard*, 23-cr-49-JMC (10 months' incarceration); *United States v. Russell*, 23-cr-29-APM (12 months and a day of incarceration); *United States v. McNamara*, 23-cr-119-ABJ (12 months' incarceration);  *United States v. Mehaffie*, 21-cr-40-TNM (14 months' incarceration); *United States v. Sargent*, 21-cr-258-TFH (14 months' incarceration); *United States v. Brackley*, 24-cr-9-CJN (15 months' incarceration).

### C.     The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

The penalties Yetman has already incurred as a result of this case are more than sufficient to deter him from ever again interfering with police.  As indicated above, he has served hard time in pretrial incarceration since November 2023 in the D.C. Jail.  And he now has a felony conviction in his record which will legally deprive him of the right to possess firearms and to vote.

These developments are serious penalties for a crime that occurred in the blink of an eye and serve as potent specific and general deterrence.  The shame Yetman has experienced is itself a guarantee of deterrence.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008) (specific deterrence satisfied by "intense shame created by the convictions); *United States*

14

*v. Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.) (same).

**Conclusion**

For all the foregoing reasons, Yetman respectfully requests a sentence no greater than a year and a day of incarceration.

Dated: July 15, 2024                      Respectfully submitted,

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Gregory Yetman*

**Certificate of Service**

I hereby certify that on the 15th day of July, 2024, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

*/s/ Nicholas D. Smith*
Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway
Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorney for Gregory Yetman*