<b>UNITED STATES DISTRICT COURT<br>FOR THE DISTRICT OF COLUMBIA</b>

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 24-cr-0093-JEB** |
| **GREGORY YETMAN** | |
| **Defendant.** | |

<u><b>GOVERNMENT'S SENTENCING MEMORANDUM</b></u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Gregory Charles Yetman to 45 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment. As determined by the United States Probation Office and calculated by the parties in the plea agreement, the defendant's sentencing guidelines range is 37 months to 46 months; accordingly, the government's recommendation falls at the high-end of that range to reflect the seriousness of Yetman's attack on besieged police officers with OC spray and his flight from arrest that necessitated a two-day manhunt.

## I.     INTRODUCTION

The defendant, Gregory Yetman, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election,

1

injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Yetman, who was at that time a sergeant in the New Jersey Army National Guard military police, joined other rioters in overrunning the police line on the West Terrace, picked up an MK-46H cannister containing OC spray, and sprayed an isolated group of police officers surrounded by other rioters for approximately 12 to 14 seconds. In response to that attack, the police officers were forced to retreat. Meanwhile, Yetman retraced his steps and held up his cellular telephone to take photographs and videos of the chaos. Yetman watched other rioters storm the Lower West Terrace and try to violently enter the U.S. Capitol building.

Later that day, Yetman posted on Facebook about what he observed at the Capitol. He blamed Antifa and the defending police officers for causing the violence and referred to the officers as "modern brown shirts." When FBI agents sought to arrest Yetman just outside his residence, he initially sought to re-enter his residence and then fled into the woods on foot. After an extensive manhunt, Yetman surrendered to police officers days later.

The government recommends that the Court sentence Yetman to 45 months of incarceration. A 45-month sentence reflects the gravity of Yetman's conduct on January 6 and his

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

flight from law enforcement officials, but also acknowledges his early admission of guilt.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 22, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.      Yetman's Role in the January 6, 2021 Attack on the Capitol

#### *Yetman's Approach to the Capitol*

On January 6, 2021, Yetman drove from his home in New Jersey, parked his car near the Franconia-Springfield Metro station, and rode the Metro into Washington, D.C., arriving at approximately 7:30 a.m. He listened to the various speeches at the rally for then-President Donald Trump at the Ellipse. From there, he made his way to the west side of the U.S. Capitol building and heard chants of "Stop the Steal!" As he later told investigators, he heard "flash bangs" and observed tear gas being deployed by U.S. Capitol police officers defending the Capitol. He saw also rioters exposed to gas and oleoresin capsicum ("OC") spray and witnessed other rioters trying to break windows in the Capitol building. He observed a police officer get pulled into the mob but—despite then being a member of the National Guard military police himself—did nothing to assist the officer.

#### *Breach of the Police Line and Spraying Police Officers with OC Spray*

When Yetman, wearing an olive-green coat, tan pants, and black wool hat, arrived at the

3

West Plaza of the Capitol building, a line of police officers blocked the rioters from moving closer to the building and up to the Lower West Terrace. The mob eventually broke through that vastly outnumbered line of officers and swarmed across platform on the West Plaza as the officers sought to regroup. Yetman made his way up to the platform along with other rioters.



***Image 1: Still Image Showing Yetman Shortly After Rioters Breached the Police on the West Plaza (Video Exhibit 1 at 0:38 Seconds with Yetman Boxed in Yellow)***

As rioters flooded across the upper platform, a group of officers from the overrun police line was encircled and assaulted on three sides.



*Image 2: Still Image Showing Rioters Assaulting Encircled Officers on the West Plaza (Video Exhibit 1 at 0:44 Seconds with Yetman Not Visible)*



*Image 3: Still Image Showing Rioters Assaulting Encircled Officers with a Thrown Fire Extinguisher on the West Plaza (Video Exhibit 1 at 0:47 Seconds with Yetman Not Visible)*

As other rioters physically assaulted the encircled officers by ramming them from behind and knocking them over the wall (Image 2) or tossing a fire extinguisher at them (Image 3), Yetman made his way to the elevated platform behind the same group of officers. Shortly thereafter, he

5

bent over to pick up an MK-46H cannister containing OC spray (a lachrymatory agent capable of causing serious bodily injury), slung it under this arm, and used it to assault the encircled officers by spraying them for approximately 12 to 14 seconds.



*Image 4: Still Image Showing Yetman Picking Up OC Spray Cannister on the West Plaza*
*(Video Exhibit 1 at 1:00 with Yetman Circled in Yellow)*



*Image 5: Still Image Showing Yetman Picking Up OC Spray Cannister on the West Plaza
(Video Exhibit 1 at 1:05 with Yetman Boxed in Yellow)*



*Image 6: Still Image Showing Yetman Spraying Police Officers with OC Spray on the West
Plaza (Video Exhibit 1 at 1:11 with Yetman Circled in Yellow)*



*Image 7: Still Image Showing Yetman Spraying Police Officers with OC Spray on the West Plaza (Video Exhibit 2 at 0:05 Seconds with Yetman Boxed in Yellow)*



*Image 8: Still Image Showing Yetman Spraying Police Officers with OC Spray on the West Plaza (Video Exhibit 3 at 0:22 Seconds with Yetman Boxed in Yellow)*

8



***Image 9: Still Image Showing Yetman Spraying Police Officers with OC Spray on the West Plaza (Video Exhibit 4 at 2:29:55 p.m. with Yetman Boxed in Yellow)***

After Yetman sprayed the police officers, they retreated south towards other officers and away from the area. Yetman then discarded the MK-46H cannister of spray on the platform. As he retraced his steps, Yetman held up his cellular telephone to take photographs and videos of the chaos.



***Image 10: Still Image Showing Yetman Taking Photographs and Videos of the Riot on the West Plaza After Spraying Officers (Yetman Circled in Yellow)***

Yetman did not then leave the U.S. Capitol grounds. Rather, he walked to the Lower West

Terrace where other rioters were attempting to enter the Capitol building through a heavily defended entrance, often referred to as a tunnel.



***Image 11: Still Image Showing Yetman on the Lower West Terrace***
***(Video Exhibit 5 at 0:25)***

While on the Lower West Terrace, Yetman chanted, "We the People!" along with the mob

10

gathered just outside of the tunnel. Video Exhibit 5 at 0:45.

### *Yetman's Social Media Posts*

On and shortly after January 6, Yetman posted a series of messages on Facebook describing his conduct at the U.S. Capitol. Among his posts, Yetman stated that "[w]hat happened at the Capitol was unfortunate and unacceptable, I was there I witnessed it." He blamed Antifa for starting the violence ("I can attest to Antifa members infiltrating our protest and meshing in with the Trump supporters . . . They riled up Trump supporters and got the violence going."). In one post, he acknowledged that the police officers defending the U.S. Capitol were "there to do their job," but wrote in another:

> I was there...we were gathering and they started lobbing oc at us.
> people got posed [sic] and rightly so. it was sad to see what our
> country has come to but being peaceful and the "nice guys" got us
> nowhere. this won't go away...the people have been wronged and
> we want justice and fairness. nobody went there to hurt law
> enforcement… but they sure as fuck hurt many people in return. they
> were relentless and i don't think i'll be backing the blue after this.
> they are modern brown shirts.

### *Yetman's Statements to Investigators*

In January 2021, FBI agents interviewed Yetman. He explained that he was a U.S. Army National Guard Military Police officer. He acknowledged going to Washington, D.C., on January 6 and attending the rally at the Ellipse and the riot at the U.S. Capitol. Yetman explained he observed that the U.S. Capitol Police were deploying gas and tried to help people with OC and gas exposure by pouring water into their eyes. He approached from the west side and heard chants of "Stop the steal!" Yetman insisted that he supports law enforcement and that anyone who entered the Capitol or assaulted an officer should be prosecuted.



*Image 12: Yetman's Photograph of the Lower West Terrace Near the Tunnel*

During the interview, Yetman showed photos, such as Image 12, above, and videos he took while at the Capitol on January 6, 2021. One photograph showed other rioters near the tunnel on the Lower West Terrace. Yetman insisted that people who entered the Capitol were "pieces of shit" who should be punished.

***Yetman's Flight from Arrest and Subsequent Fundraising***

On November 8, 2023, federal investigators attempted to arrest Yetman for his conduct on January 6. When he saw the officers approach, Yetman first attempted to re-enter his residence. When he was unable to do that, he fled into the woods on foot. He dropped a knife and a cellular telephone he was carrying as he fled. Investigators subsequently executed federal search warrants

for Yetman's residence and vehicle. They found multiple firearms and significant quantities of ammunition in his residence, a loaded firearm in his vehicle, and additional firearms and weapons in a storage unit. After an extensive manhunt that lasted several days, Yetman turned himself into local police officers on November 10, 2023.

Within two weeks of his arrest, Yetman's family had established a "GiveSendGo" account on behalf of Yetman to raise funds for his legal expenses. The request for legal fees described Yetman as someone "who was with the peaceful protestors on Jan 6th at the capital" and claimed the FBI and other agencies surrounded his home to execute a warrant "with no regard of due process or the constitution." The request sought to justify Yetman's flight by claiming he feared "being falsely imprisoned, like many other Jan 6th protestors." A post to Yetman's GiveSendGo page dated November 23, 2023, complained that "This has been a nightmare for all of us involved and so many other families that are dealing with this J6 nonsense."[2] As of July 15, 2024, the account had raised $42,139.

### III.     THE CHARGES AND PLEA AGREEMENT

On February 21, 2024, a federal grand jury returned an indictment charging  Yetman with six counts, including, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); Assaulting Certain Officers Using a Dangerous Weapon, in violation of 18 U.S.C. § 111(a)(1) and (b); Entering and Remaining on Restricted Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(1) and (b)(1)(A); Disorderly/Disruptive Conduct on Restricted Grounds with a Deadly

---

[2]  That same post also describes receiving a call from the defendant on November 16. Subsequent posts (dated December 3, December 7, December 11, December 15, December 21, January 2, January 8, February 5, and May 15) describe frequent additional communications with Yetman.

or Dangerous Weapon, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A); Engaging in Physical

Violence on Restricted Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C.

§ 1752(a)(4) and (b)(1)(A); and Act of Physical Violence on the Capitol Grounds, in violation of

40 U.S.C. § 5104(e)(2)(F).

On April 25, 2024, Yetman pleaded guilty pursuant to a plea agreement to Assaulting

Certain Officers, in violation of 18 U.S.C. § 111(a)(1). ECF 21 and 22.

## IV.    STATUTORY PENALTIES

Yetman now faces sentencing for Assaulting Certain Officers in violation of 18 U.S.C.

§ 111(a)(1). As noted by the plea agreement and the Presentence Report issued by the U.S.

Probation Office, Yetman faces up to 8 years of imprisonment, a term of supervised release of not

more than three years, a fine up to $250,000, restitution, and a mandatory special assessment of

$100.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings

by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

(2007). In the plea agreement, the parties stipulated to the following Guidelines calculation that

was adopted by the PSR:

Count Two (lesser included offense): 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Use of a Dangerous Weapon | +4 |

---

[3] Section 2A2.2(a) applies by cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) is used if the conduct constituted aggravated assault.

| | | |
|---|---|---|
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |
| Acceptance of responsibility (U.S.S.G. §3E1.1) | | -3 |
| **Total Adjusted Offense Level:** | | **21** |

*See* Plea Agreement at ¶ 5(A); PSR ¶¶30-41.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case pursuant to U.S.S.G. § 4C1.1(a)(3) and § 4C1.1(a)(7). The plea agreement stipulates that Yetman used violence or credible threats of violence in connection with the offense and that Yetman possessed a dangerous weapon. Accordingly, Yetman is ineligible to receive the adjustment based on U.S.S.G. 4C1.1. *See* Plea Agreement at ¶5(C).

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶44. Accordingly, as the plea agreement and the PSR recite, the total adjusted offense level after acceptance of responsibility is 21. Yetman's Guidelines imprisonment range is 37 to 46 months.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Yetman's felonious conduct on January

6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Yetman was a part of the riotous mob that overran the police line at the West Plaza. Immediately afterwards, Yetman went behind group of besieged police officers and, as they were being attacked by other rioters, picked up a cannister of OC spray and began spraying them with it. Those officers then had to retreat from that location. The nature and circumstances of Yetman's offense was of the utmost seriousness, and fully support the government's recommended sentence of 45 months.

### B.  The History and Characteristics of the Defendant

Yetman obtained an Associate's Degree in Criminal Justice, and a Bachelor of Science in Public Safety Administration with a minor in Criminal Justice. PSR ¶66. While Yetman lacks any criminal history prior to the instant offense, the seriousness of his conduct on January 6, and in particular his willingness—as a then-active military police officer—to use a dangerous weapon against fellow police officers that even he recognized were just "there do to their job" defending the U.S. Capitol from the riotous mob weigh heavily in favor of incarceration here. Furthermore, despite his background in law enforcement, Yetman chose to flee from lawful arrest in November 2023 and to remain in hiding for several days which necessitated an extended manhunt that consumed substantial police resources and disrupted the local community with street closures and school shelter-in-place orders—consequences that were, given his training and experience as a military police officer, all reasonably foreseeable. Significantly, however, his flight is not reflected in Yetman's sentencing guidelines calculation and therefore militates in favor of a sentence at the

16

high-end of the calculated guidelines range. Finally, since his arrest, Yetman and his family have raised over $42,000, in part by claiming that he feared "being falsely imprisoned," a significant pool of assets that Yetman nonetheless failed to disclose and was only discovered as a result of independent research conducted by the U.S. Probation Department. PSR ¶78. Indeed, Yetman specifically denied "having any assets, bank accounts, investments, cryptocurrency, real estate property, or other assets." PSR ¶75. Yetman's failure to disclose to Probation the existence of significant funds raised on his behalf and in his name by his family warrants further sanction and supports a significant period of incarceration.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Yetman's criminal conduct on January 6 was the epitome of disrespect for the law. "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20.

### D.   The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[4] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. At the time Yetman assaulted police officers defending the U.S. Capitol, he was himself a military police officer. Despite his oath to the Constitution, and his years of experience working in law enforcement, Yetman did not hesitate to pick up a cannister of OC spray and turn it on his fellow police officers. Yetman saw that the officers he sprayed were surrounded and under assault by dozens of other rioters—but he targeted them just the same. Those officers were forced to fall back and retreat closer to the U.S. Capitol. *See* Exhibit 4 (showing body-worn camera footage of Yetman's assault).

Even after January 6, and having had time to reflect on his actions, Yetman concluded that it was the police officers defending the U.S. Capitol were to blame for the violence on January 6. Yetman's insistence that he was on the side of "nice guys" which did not seek to hurt police officers on January 6 is completely undermined by the video exhibits submitted in support of the Government's sentencing memo. Those videos document Yetman's presence at the breach of the police line on the West Plaza; his decision to join the riotous mob in immediately overrunning the platform and flanking the broken remnants of the police line; and his willingness to assault police officers himself by attacking them with OC spray. In other posts, Yetman claimed to "not condone"

---

[4] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

the attacks on "our brothers and sisters in blue" but made no mention of his assault on police officers. Indeed, Yetman told investigators in January 2021 that he supported law enforcement and believed that anyone who assaulted police officers should be prosecuted. PSR ¶24. However, when the time came for Yetman to be held accountable for his assault on police officers, he sought to evade prosecution and fled into the woods for days. PSR ¶25.

Insofar as Yetman now seeks to express remorse and contrition, the Government submits that those words are in sharp contrast to his conduct on January 6, his statements on social media, and his attempt to evade accountability by fleeing from arrest. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Yetman's sentence must provide specific deterrence from committing future crimes of violence, particularly in light of his repeated efforts to deflect and evade responsibility for his conduct on January 6.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means

that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[5] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[6] While no previously sentenced case contains the same balance of aggravating and mitigating

---

[5] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[6] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Yetman's conduct on January 6 is comparable to that of James Mault and Cody Mattice, both of whom were sentenced to 44 months, although neither of them fled from arrest. *United States v. Mattice and Mault*, 21-cr-657-BAH. On January 6, Yetman made his way to the front of the crowd of rioters on the West Plaza, as did Mattice and Mault. Once there, Mault made a series of comments to police and Mattice pulled down a segment of the metal barricades that stood in front of the police line. Similarly, Yetman was among the first to swarm the platform as rioters overran the police line where he quickly assaulted officers with OC spray. And although Mattice and Mault admittedly took steps to bring both physical protection and pepper spray with them to Washington, D.C., both ultimately used OC spray that had been taken from police defending the Capitol to assault those same officers—just like Yetman. Moreover, like Yetman, Mault and Mattice showed no remorse for their crimes immediately after January 6. Rather, they exchanged a series of text messages in which they sought to downplay and disavow their conduct, glossing over their use of chemical irritants to assault police officers. That was comparable to Yetman's lengthy social media posts in which he disingenuously proclaimed his support for law enforcement and willingness to see anyone who assaulted them prosecuted while saying nothing about his own complicity in assaulting the police. Likewise, Yetman, Mault, and Mattice all sought to blame Antifa for the violence at the Capitol despite knowing full well of their own complicity in that violence. Mault also had military experience—although he was not, as Yetman was, in the military at the time of his offenses.

Both Mault and Mattice were indicted with assault with a dangerous weapon (pursuant to 111(b)) but pleaded guilty to lesser included offense of assault (pursuant to 111(a)), resulting in identical sentencing guidelines ranges to Yetman. Judge Howell sentenced both to 44 months of incarceration. Unlike Yetman, however, neither Mault nor Mattice absconded at the time of their arrest. Given that additional and substantial aggravating factor, this Court should impose a higher sentence on Yetman than the one Mault and Mattice received.

*United States v. Christian Manley*, 1:21-cr-691-TSC, provides another useful comparison. Like Yetman, Manley had military training as a former U.S. Marine, and participated in storming the west side of the U.S. Capitol. Manley had a higher criminal history than Yetman and pleaded guilty to violating 18 U.S.C. § 111(b) rather than the lesser included offense of § 111(a) (with the dangerous weapon enhancement). Manley's sentencing guidelines range, 53 to 61 months, was higher than Yetman's. Manley's conduct was also more egregious than Yetman's. Manley assaulted police officers with two cannisters of pepper spray that he brought with him (along with a collapsible baton). He also threw objects at the officers and used his body to push against them. Unlike Yetman—who fled from arrest—Manley immediately spoke with law enforcement officers and admitted to much of his conduct at his arrest. Like Yetman, Manley was detained prior to pleading guilty. Judge Chuktan sentenced Manley to 50 month's incarceration.

*United States v. Ryan Swoope*, 23-cr-00020-TNM, is another comparable case. Yetman's conduct on January 6 is comparable to that of Ryan Swoope, who like Yetman, was indicted for violating § 111(a)(1) and (b) for assaulting a police officer with O.C. spray; like Yetman, Swoope pleaded guilty to the lesser included offense of § 111(a)(1) with a dangerous weapon enhancement.

Swoope, however, had a higher calculated sentencing guidelines range as a result of injuries he caused to the officer that he sprayed, while there is no evidence that the officers Yetman sprayed suffered comparable injuries. On the other hand, unlike Yetman, Swoope was not a military police officer at the time of his attack on the officers defending the U.S. Capitol building, and Swoope did not flee from arrest. Judge McFadden sentenced Swoope to 51 months' incarceration. A slightly lower sentence is warranted for Yetman.

This Court presided over *United States v. Jacob Therres*, 22-cr-381-JEB, another comparable case. Therres' conduct on January 6 was worse than Yetman's. Therres confronted the police line defending the West Plaza and threw a long wooden plank at an officer, causing him to briefly lose consciousness. Therres then climbed to the inaugural stage area, looted a police department OC spray cannister, and used it to spray police officers. Unlike Yetman, Therres had a criminal history on January 6. But Yetman's post assault conduct was worse than that of Therres. Therres—unlike Yetman—promptly left the U.S. Capitol grounds following his assault on police. Therres lacked the training and knowledge as a military police officer that Yetman brought to bear against his fellow officers. And despite Yetman's public claims to support law enforcement and his statement to investigators that rioters who assaulted police officers should be prosecuted, Yetman fled from arrest. Therres did not do those things. Likewise, on January 6, Therres was roughly twenty-years younger than Yetman and attended the riot with his step-father Douglas Wyatt—a father figure whose presence and own conduct that day likely influenced Therres. This court sentenced Therres to 40 months' incarceration. Given Yetman's protracted flight from FBI

agents, endangering them, himself, and possibly others, the government urges this Court to impose a higher sentence on Yetman than it did on Therres.

**VII.    RESTITUTION**

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[7] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case did not suffer bodily injury as a result of Yetman's assault. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Yetman must pay $2,000 in restitution, which reflects in part the role

---

[7] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

25

Yetman played in the riot on January 6.[8] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Yetman's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶10.

## VIII.   FINE

Yetman's convictions for violations of 18 U.S.C. § 111(a) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *see* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's

---

[8] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, Yetman has not shown an inability to pay; thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $15,000 to $150,000. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. As the PSR notes, Yetman has raised over $40,000 in an online GiveSendGo account. PSR ¶78. The website seeks funds for "legal and financial obligations while he is incarcerated," including costs associated with incarceration (phone and commissary), lawyer's fees, and monthly bills. Yetman, however, reported $3,100 in monthly income, meaning the funds raised already exceed his annual earnings. He should not be permitted to use his notoriety—gained first by his crimes on January 6 and later by his flight from arrest—to capitalize on his participation in the U.S. Capitol breach in this way.

//

//

//

//

//

//

//

27

## IX.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 45 months' incarceration, three years of supervised release, $2,000 in restitution, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

*/s/ Craig Estes*
CRAIG ESTES
Assistant United States Attorney
United States Attorney's Office for the
District of Columbia (detailee)
Massachusetts Bar No. 670370
craig.estes@usdoj.gov

## CERTIFICATE OF SERVICE

A copy of the foregoing was served upon all parties listed on the Electronic Case Filing (ECF) System.

*/s/ Craig Estes*
Craig Estes
Assistant U.S. Attorney (detailee)